UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:10-CV-00176-R

JOHN MARTIN and P.M.
by and through his next friend
JOHN MARTIN                                                                    PLAINTIFFS

v.

BRIAN COYT                                                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's motion for summary judgment (DN 26).  Plaintiffs have

responded (DN 33) and Defendant has replied (DN 37).  This matter is now ripe for adjudication.

For the reasons that follow, Defendant's motion is GRANTED IN PART AND DENIED IN

PART.

## BACKGROUND

This matter arises out of several altercations between the members of two families: the

husband/wife duo of Brian and Hannah Coyt ("Brian" or "Hannah" or collectively "Coyts") and

the father/son tandem of John and Phillip Martin ("John" or "Phillip" or collectively "Martins").[1]

On September 17, 2010, a near traffic accident and series of interactions between these

individuals culminated in the arrests of John and Phillip by Brian, a trooper with the Kentucky

State Police.  Stemming from these arrests, the Martins brought suit against Brian, who now

moves for summary judgment.

---

[1] During the relevant period and at the time the lawsuit was filed, Phillip was a minor.  He has since reached the age
of majority.  The Court will refer to him by name considering his newfound status as an adult.

The conflict between the Martins and Coyts occurred in and around the small community of Knifely, Kentucky.  The main participants in this controversy are all neighbors and live less than a mile from one another.  They were acquainted on some level before this dispute erupted.

On September 17, 2010, the Martins were in the process of moving furniture between their residence ("Martin Residence") and another house.  With the help of Donald Tucker, the Martins placed the furniture on a trailer and began to drive along Tucker Warren Road.  Tucker drove the vehicle hauling the trailer while John followed in his own truck.  While ascending a hill, the two-car caravan met a white Ford Expedition driven by Hannah traveling the opposite direction.  Tucker and the Martins allege that Hannah's speed and positioning on the road caused Tucker to drive onto the shoulder to avoid a collision.  Hannah slowed momentarily after she passed the group, but continued on without leaving her vehicle.  The vehicles did not make contact and no one was hurt in this near accident.

After determining that his son and Tucker were not injured, John turned around and drove in the direction of the white Ford Expedition.  Though the vehicles had not touched, John believed the Ford Expedition had fled the scene of an accident since Tucker was forced to leave the road.  John eventually saw the Ford Expedition at the Coyt residence.  From inside his home, Brian noticed John's vehicle stop in front on his house.  Brian exited and approached the car to investigate.  At this point, John did not know the identity of the driver of the Ford Expedition and Brian was unaware of his wife's near collision.

The two men, Brian standing in the road and John still in his car, began to speak about the encounter on Tucker Warren Road.  After hearing the details, Brian informed John that there could not have been an accident without contact between the cars.  This diagnosis of "non-

2

accident" resolved the issue temporarily because John drove away and Brian returned to his house.  John says he was "very polite" during the exchange.

Later in the day, Hannah gathered up two of her children to take them to her mother's house where she was meeting her ex-husband, Jeff Greer, for a scheduled visitation.  During transit in the Ford Expedition, Hannah passed the Martin Residence where John and several men were gathered in the yard.  She claims that as she drove by, John waved his arms at her and yelled "come back here bitch."  The Martins deny this incident of roadside heckling took place.

Hannah parked near the road when she arrived at her mother's house.  A few minutes later, the Martins drove up in another vehicle and stopped in the road nearby.  John rolled down the window and started to speak with Hannah about the incident on Tucker Warren Road.  The Martins assert that Hannah became hostile toward them, insisting that what occurred was not an accident because the vehicles did not touch.  Hannah relates a different story where John was verbally abusive toward her.  Either way, Greer eventually approached the car and informed John that he needed to "go ahead and leave."  John obliged, but told Hannah as he pulled away that he would "see her in court."  This entire episode lasted two or three minutes.

Hannah then telephoned Brian and relayed the details of the confrontation.  Brian met Hannah at her mother's house, and after speaking with his wife, he says he had "reasonable suspicion" to believe John's actions constituted either second degree stalking or second degree harassment under Kentucky law.  Brian's affidavit explains this conclusion:

> From the tone of Hannah's voice and from her description as to what happened, and knowing that [John] had just had four different contacts with Hannah in a very short period of time which left her very upset plus, being familiar with [John's] background, I felt that I needed to find out why [John] was acting this way toward Hannah.  Based upon what I have heard in the community . . ., I suspect [John] was a drug dealer and he obviously knew I was a Kentucky State

3

> Police Officer.  I was very cautious and concerned about [John] and what he might do because of his reputation.  I thought that he was stalking Hannah. . . . I was concerned that his conduct could escalate into a situation resulting in physical harm to Hannah and I made the decision to investigate the before any further incidents occurred.

Coyt Aff., DN 27-2 p. 9.  Brian used the license plate number from John's car to retrieve the address of the Martin Residence and then drove over with the intention of asking some questions. Brian was not in uniform but had his service weapon on his belt.

From this point, the parties present two wildly different stories.  The narrative is further complicated by the pseudo-presence of Officer Joey Burress of the Adair County Sheriff's Department, who was on the phone with John during part of the encounter between Brian and the Martins.  Below, the Court divides the events from the perspective of each witness:

> Burress: John contacted local law enforcement prior to Brian's arrival at the Martin Residence to ascertain whether the incident on Tucker Warren Road was an accident.  Burress returned John's call and informed him that without contact between the vehicles an accident was not possible.
>
> During their conversation, John told Burress that a Kentucky State Police cruiser had just pulled onto his property and a man in plain clothes was approaching his house.  Burress says he heard someone say "what are you doing talking to my wife that way?"  John informed the unknown party that he was on the phone with a police officer, to which the voice responded that no accident had occurred.  Burress said the unknown party sounded angry.
>
> John then asked Burress if he could go back into his house.  Burress told John that he could.  Shortly thereafter, Burress heard John scream for help and what sounded like someone kicking in a door.  The call was then disconnected. Burress informed his superiors of the situation and went to the Martin Residence to investigate.  By the time he arrived, Brian had the Martins in custody.

> Brian: When he reached the Martin Residence, Brian pulled to within 25 feet of the front door.  John was standing at the top of the front stairs talking on his cell phone.  Brian got out of his cruiser, and while walking toward the house, asked John why he believed there had been an accident on Tucker Warren Road? Instead of answering, John said that he was going back into his house.  Brian ordered John to stay outside.
>
> Brian reached the steps as John was turning to go into the house.  Brian then wedged his foot between the door and the frame to prevent John from closing

it, reached inside the house, and grabbed John's right arm.  He asserts the seizure was necessary because he wanted to ask John about the day's earlier events and investigate possible stalking and harassment charges.  Taking John's right arm, Brian attempted to pull him back through the door into the front yard.

Brian's affidavit is unclear on when exactly he noticed the presence of Phillip, but at this point, he claims Phillip came "over the top of his arm."  Next, Brian saw a silver object in Phillip's hand that he thought was a gun but was actually a cell phone.  In any event, Brian grabbed Phillip and pulled him out of the front door and threw him on the ground.  John then "came toward him" and Brian employed a defensive maneuver to knock him to the ground.

At this point, all three men were in the front yard.  Brian says the Martins heckled him, resisted arrest, and disobeyed his commands.  Outnumbered, Brian drew his weapon and aimed it at the two.  He then arrested the Martins, cuffing both and placing them in his squad car.  He radioed for backup and informed dispatch he had two suspects in custody.  At length, other officers arrived.

<u>John and Phillip</u>:  When Brian's cruiser arrived, the Martins were standing near the front door and emerged from the house to investigate.  According to John, Brian exited the vehicle and started "coming at him," all the while asking why he had spoken with his wife and stressing there had been no traffic accident.  Brian also remarked that he wanted to "take John around back," which John interpreted to mean Brian wanted to physically harm him.  It was obvious to the Martins that Brian was very angry.

After a few moments of Brian asking questions, John told Brian he could not continue to stand there and argue.  He asked Burress if he and Phillip could go back inside the house.  Burress assented and John told Brian that they were returning to the house.  The Martins do not remember Brian ordering them to stay outside.

The Martins turned and entered the doorway.  With the door almost closed behind them, Brian kicked the door open and grabbed John by the arm.  John was knocked off balance by Brian jerking him down the front steps.  Phillip reacted by reaching for his father to steady him and telling Brian to "get out of his house."  Brian then grabbed Phillip and threw him down the front steps onto a pile of concrete blocks near the door.  Phillip denies he had his cell phone or anything else in his hand.

Despite the spill, Phillip got up almost immediately.  Brian responded by drawing his weapon, training it on Phillip, and telling him to "get down or I will blow your fucking brains out."  Phillip complied and then Brian turned his attention to John.  He gave the same emphatic orders with the same threats to kill John if he did not cooperate.  John told Brian he had an artificial knee and was not capable of lying down.  Brian walked over to John and knocked him down.  He then handcuffed John and dragged him 15 feet across the yard to the cruiser.

The Martins were searched and put in the backseat of the cruiser.  Both were eventually arrested and transported to jail.

Brian arrested the Martins on a variety of charges.  John was arrested for menacing and resisting arrest.  He was also arrested for having a prescription medication out of its proper container after Brian discovered a pill in his pocket.  Phillip was arrested for menacing, resisting arrest, and hindering apprehension in the second degree.  After being transported to the jail, both were released on bail.  On October 4, 2010, all charges were dismissed by the prosecutor for Adair County.  Describing this decision in a deposition, the prosecutor was particularly blunt in her criticisms of Brian's behavior and his decision to arrest the Martins.

On November 11, 2010, the Martins filed this lawsuit against Brian in his individual capacity.  Complaint, DN 1-2 ¶ 5.  The Martins allege violations of their Fourth, Eighth, and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1983 and 1988.  They also pursue the state-law torts of assault, battery, outrage, false arrest, and malicious prosecution.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere

scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I. Constitutional violations

The Martins assert violations of their constitutional rights under the Fourth, Eighth, and Fourteenth Amendments, all brought pursuant to 42 U.S.C. § 1983.  Section 1983 provides a federal forum for injured parties to seek a remedy for the deprivation of their civil liberties.  *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66 (1989). "To state a valid § 1983 claim, Plaintiff must establish that: (1) he was deprived of a right secured by the Constitution or the laws of the United States, and (2) the deprivation was caused by a person acting under the color of state law."  *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir. 2001) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)).  "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail."  *Id.*  Even though Brian was off duty and not in uniform during the altercation, neither party disputes that his actions were a sufficient manifestation of official authority to arise under state law.  *See Parks v. City of Columbus,* 395 F.3d 643, 646-52 (6th Cir. 2005) (off-duty officer acted under color of state law when he moved the suspect, displayed a badge, identified himself as a police officer and threatened to arrest the suspect); *Memphis,*

*Tennessee Area Local, American Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004) (factors for determining whether off-duty officer acted under color of state law included whether he arrested subject and identified himself as a police officer).  As such, the Court proceeds to whether Brian violated the Martins' constitutional guarantees.

    A. <u>Fourth Amendment</u>

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The amendment protects citizens from warrantless intrusions into the home subject to a narrow group of exceptions, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), mandates that all arrests be supported by probable cause, *Radavansky v. City of Olmstead Falls,* 4496 F.3d 609, 614 (6th Cir. 2007), and prohibits the application of excessive force during an arrest.  *Beier v. City of Lewiston,* 354 F.3d 1058, 1064 (9th Cir. 2004).  The Martins describe violations for each of these protections.

Brian claims he is entitled to qualified immunity for each proposed constitutional violation.  Qualified immunity exists to protect government officials when they perform discretionary functions.  *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  In such situations, defendant officials are generally protected from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights.  *Phillips v. Roane County, Tenn.,* 534 F.3d 531, 538-39 (6th Cir. 2008).  The federal courts approach the issue of qualified immunity by asking two questions: First, viewing the facts in a light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation occurred?  Second, if so, was

8

the constitutional right clearly established at the time of the violation?  *Silverstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006).  If the acts, taken in a light most favorable to the plaintiff, fail to show that the defendant officials' conduct violated the plaintiff's constitutional rights, then the inquiry is at an end.  *Weaver v. Shadowin,* 340 F.3d 398, 406 (6th Cir. 2003) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).

       1.  <u>Entry through the front door and seizure of John by the arm</u>

The Martins assert Brian violated the Fourth Amendment's prohibitions against warrantless entry when he reached through the front door, grabbed John, and pulled him back into the yard.  The Court will simultaneously review the constitutionality of the entry through the doorway and the seizure of John inside his house.

"The 'chief evil' against which the Fourth Amendment protects is the 'physical entry of the home.'"  *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (quoting *Payton v. New York,* 445 U.S. 573, 585 (1980)).  The prohibition of warrantless entry applies equally "whether the police enter a home to conduct a search or seizure or for some other purpose."  *Id.* (citing *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996)).  While police entry without a warrant may be constitutionally forgivable when exigent circumstances exist, courts are unequivocal "that probable cause is a precondition for any warrantless entry to seize a person in [a] home."  *LaLonde v. County of Riverside*, 204 F.3d 947, 955 (9th Cir. 2000).  Warrantless entry into a home for the purposes of effectuating an arrest for a minor offense "should rarely be sanctioned,"  *Welsh v. Wisconsin,* 466 U.S. 740, 753 (1984), and under this circuit's prior precedent, is only constitutional where there is consent by the occupant or an exigency.  *Denton v. Rievley*, 353 F. App'x 1, 6 (6th Cir. 2009).

9

The propriety of summary judgment in this case turns on the answers to three questions: where was John when Brian seized him, was John afforded the Fourth Amendment's expectation of privacy after he stepped back into his house, and did probable cause and an exigency exist that would permit Brian to enter the Martin Residence and seize John?  The parties agree on two of these points.  Brian admits he reached across the threshold of the doorway and at least part of his body extended into the house when he grabbed John by the arm.  He also acknowledges that prior to reaching through the doorway, no probable cause existed to arrest John for any offense.  Nevertheless, Brian proposes that he arrived at the Martin Residence with reasonable suspicion that John had either stalked or harassed Hannah, in violation of Kentucky law.  He argues that this entitled him to detain John pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) so as to investigate these offenses, without regard to John's location.  Even with these concessions, the Court addresses all three inquiries below.

The record is clear that the Martins were in the house when Brian forced the door open.  Brian agrees that he "caught up with John as he stepped inside the house" and then grabbed him in an attempt "to pull him back outside."  *See* Coyt Aff., DN 27-2 p. 10.  Brian says he breached the threshold of the Martin Residence to take hold of John.  *See* Coyt Aff., DN 27-2 p. 10 ("I did not go into the Martin home.  At least one foot was always on the top step.").  Under either party's version, John was in the house when Brian grabbed him.

Next, the issue becomes what rights John possessed under the Fourth Amendment just over the door's threshold?  In its seminal decision of *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court established the front door as the "firm line" separating the constitutional protections of the home from the public arena.  *Id*. at 590.  Despite *Payton*'s holding, that "[the

10

entrance's] threshold may not reasonably be crossed without a warrant," *id.*, the law of some circuits raises doubts about the rights of individuals in a home's entryway.  The Second Circuit in *United States v. Gori*, 230 F.3d 44 (2d Cir. 2000), upheld a *Terry* stop in a doorway when the police approached the door of an apartment they believed contained narcotics.  *Id.* at 47-52.  The court allowed the investigatory stop in the entryway because "'[a] suspect in her open doorway becomes 'as exposed to public view, speech, hearing, and touch as if she had been standing completely outside his house.'"  *Id.* at 52 (quoting *United States v. Santana*, 427 U.S. 38, 42 (1976)).  The appeals court concluded that when the individuals opened the door to the residence, "they created a vista from a public area or common area" that diminished their expectations of privacy.  *Id.*  The Ninth Circuit has likewise held that "when a suspect voluntarily opens the door of his residence in response to a non-coercive 'knock and talk' request, the police may temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity."  *United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007).  The reach of *Crapser* is limited, insofar as there was a "critical difference . . . between the inside of the home and the outer threshold and beyond."  *Id.* at 1149.

Notwithstanding *Gori* and *Crapser*, the Sixth Circuit has chosen a different tack with Fourth Amendment detentions at a home's entrance.  In *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), it explicitly rejected an argument that the police were permitted to perform an investigatory stop under *Terry* in a person's residence.  *Id.* at 809-810.  There, the government argued that a seizure of an occupant at gunpoint in his doorway was not an arrest but instead an investigatory stop.  *Id.* at 809.  The court disagreed and found the police had arrested the defendant upon exiting his house, but went on to reject the government's argument that *Terry*

permitted investigatory stops in the home. *Id*. It believed that such a result "would have the effect of providing lesser protection to individuals in their homes when the police do not have probable cause to arrest." *Id*. The court emphasized that the proposed expansion of *Terry* would have the illogical result of permitting a "warrantless in-home seizure . . . to further an investigation" but still require "a warrant or exigent circumstances . . . when officers have the probable cause and intent to arrest." *Id*. Ultimately, *Saari* upheld the principle that "warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, [and this protection] applies . . . regardless of whether the officers at issue were conducting an arrest or an investigatory detention." *Id*.

The thrust of *Saari* has been reaffirmed on two separate occasions. In *Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005), officers investigating a domestic disturbance arrived at a house and knocked on the door. *Id*. at 680-81. The suspect opened a window near the door and spoke with the officers. *Id*. The suspect then moved to the front door, cracking it ajar and continuing the conversation. *Id*. After the suspect refused to let the officers inside, they forced their way in when they detected the aroma of marijuana. *Id*. The Sixth Circuit overturned the arrest, concluding the suspect had attempted to limit his exposure to the public and "manifest[ed] his intent to keep the inside of his home private." *Id*. at 685.

In *Denton v. Rievley*, 353 F. App'x 1 (6th Cir. 2009), this circuit continued its skepticism of warrantless intrusions across the threshold of a residence. There, a police officer was dispatched to the plaintiff's residence to investigate a complaint of domestic violence. *Id*. at 2. Without a warrant, the officer went to the front door and began questioning the plaintiff. *Id*. The officer saw evidence of a domestic disturbance on the front porch and, after a protracted

argument, decided there was probable cause to arrest.  *Id*.  The officer then reached over the threshold, took hold of the plaintiff's arm, and arrested him.  *Id*.  The Sixth Circuit upheld the denial of summary judgment, agreeing that the plaintiff did not expose himself to the public view and possessed a reasonable expectation of privacy in his doorway.  *Id*. at 5.

Collectively, *Saari*, *Cummings*, and *Denton* advance *Payton*'s holding that bars warrantless seizures across the entrance's "firm line" without an exigency and probable cause. For the current case, Brian lacks both.  No exigency was present to justify Brian's entry into the Martin Residence.  "[E]xigent circumstances exist when 'real immediate and serious consequences' would certainly occur if a police officer were to 'postpone action to get a warrant.'"  *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 751 (1984)).  The normal scenarios for exigent circumstances were absent: John was not fleeing felon, no threat existed that he would destroy evidence, and he was not attempting to escape.  *See United States v. Williams,* 354 F.3d 497, 503 (6th Cir. 2003). Though Brian insists he was nervous when John reentered his house, the Martin's account of the incident belies any argument that Brian harbored legitimate fears for his safety.

Nor was there probable cause to arrest John.  Brian does not dispute he only had reasonable suspicion to believe John violated Kentucky's statutes for harassment and stalking. Coyt Aff., DN 27-2 p. 10.  *Saari* stresses that "[i]t would defy reason to hold . . . that a warrantless in-home seizure is authorized to further an investigation."  *Saari*, 272 F.3d at 809. Other courts have adopted similar reasoning and rejected *Terry* investigative stops inside a residence.  *See e.g.*, *Harman v. Pollock*, 586 F.3d 1254, 1262 (10th Cir. 2009) (citing favorably to precedent that rejects the application of *Terry* to in-home detentions); *Crapser*, 472 F.3d at

1149 ("Our cases establish that *Terry* does not apply inside a home."); *United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) ("Certainly, the usual rules pertaining to *Terry* stops do not apply in homes."); *Sledge v. Stoldt*, 480 F. Supp. 2d 530, 534 n. 5 (D. Conn. 2007) ("*Terry* . . . does not provide an exception to the requirement that an officer must obtain a warrant to enter an individual's home to detain the individual or arrest the individual.").

Further, John was due the protections of the Fourth Amendment since he was not exposed to public view.  When Brian arrived at the Martin Residence, John was drawn outside not from a knock-and-talk encounter, but instead emerged to investigate the presence of the police cruiser.  After speaking with Brian, John reentered his house and closed the door.  Brian's preventative measure, whether wedging his foot in the door or kicking it open, does not impact John's reasonable beliefs that by shutting the door behind him he would secure the privacy he sought.  Additionally, John's location in the house translates to the Fourth Amendment's protection.  *See Denton*, 353 F. App'x at 2 (suspect due reasonable expectation of privacy when just inside entryway); *Cummings*, 418 F.3d at 680-81 (same); *Saari*, 272 F.3d at 806-07 (same).

With John inside the confines of his home, Brian acting without probable cause and exigent circumstances, and John due an expectation of privacy, summary judgment on this portion of the Martins' claim is improper.  The jury could reasonably find Brian's act of reaching through the doorway was tantamount to an unconstitutional entry.  As the police may not enter the home and detain someone without a finding of probable cause, a jury could also conclude that John's seizure was constitutionally impermissible.[2]

---

[2] Since probable cause is a precondition for a warrantless seizure in a home, the Court need not examine whether a reasonable police officer would have thought there was reasonable suspicion to believe John had harassed or stalked Hannah.  *Cf. United States v. Washington,* 387 F.3d 1060, 1067 (9th Cir. 2004); *Saari*, 272 F.3d at 809-10; *United States v. Morgan*, 743 F.2d 1158, 1163-64 (6th Cir. 1984).

Insofar as Brian contends the aforementioned constitutional rights are not clearly established, he is wrong.  "When analyzing whether a constitutional right was clearly established at the time of the events in question [the Court] 'must look first to decisions of the Supreme Court, then to decisions of [the appeals court] and other courts within our circuit, and finally to decisions of other circuits.'"  *Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009) (quoting *Buckner v. Kilgore,* 36 F.3d 536, 539 (6th Cir. 1994)).  Legal precedent from this circuit abounds on the illegality of warrantless entries of a home and the prohibition against stopping a suspect under *Terry* while not in public.  Thus, summary judgment on Brian's warrantless entry and his seizure of John is DENIED.[3]

## 2. False arrest of John and Phillip

The Martins declare Brian defied the Fourth Amendment by arresting them without probable cause.  "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause."  *Fridley v. Horrighs,* 291 F.3d 867, 872 (6th Cir. 2002).  "A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime."  *Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir. 2000).  "No overly-burdensome duty to investigate applies to officers faced with the prospect of a warrantless arrest."  *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007).

When deciding whether an arrest was supported by probable cause, a court should "look to the totality of the circumstances" and "consider only the information possessed by the arresting officer at the time of the arrest."  *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citations omitted).  "'A finding of probable cause does not require evidence that is

---

[3] The parties' affidavits and depositions show that Brian entered the house after he arrested the Martins to retrieve some medicine at John's request.  The Court does not discuss whether Brian's subsequent entry violated the Fourth Amendment, as it was premised on consent.

completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime.'" *Everson v. Leis*, 556 F.3d 484, 499 (6th Cir. 2009) (quoting *Harris*, 513 F.3d at 511). What passes for probable cause turns on the nature of the criminal statute as compared to the arrestee's behavior. *Evans v. City of Etowah*, Tenn., 312 F. App'x 767, 769 (6th Cir. 2009). Although probable cause is typically a jury issue in the context of § 1983, "'an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent.'" *Everson*, 556 F.3d at 499.

Phillip was arrested for menacing, resisting arrest, and hindering apprehension in the second degree. Addressing the facts in his favor, only three of Phillip's actions could form the basis of the criminal charges: (1) placing his hand on John when Brian began pulling him out of the house, (2) telling Brian to "get out of here" during the intrusion through the front door, and (3) standing up in the yard after Brian threw him down. According to Phillip, the physical gesture to grab John was not directed at Brian and he never made contact with the officer. He also clarifies that he did not "yell" or "scream" the phrase "get out of here," but simply "said" the words. Phillip Depo., DN 28-2 p. 1-3.

"A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." KRS § 508.050. Cases dismissing claims of false arrest for menacing typically include overt physical acts of aggression directed toward another person. *See e.g.*, *Eubank v. Wesseler*, No. 10–210–DLB–JGW, 2011 WL 3652558, at *9 (E.D. Ky. Aug. 19 2011) (husband grabbed wife, causing her pain, and pushed

16

her down on the couch); *Hatter v. Livingood*, No. 5:07-2-JMH, 2008 WL 2228878, at *4 (E.D. Ky. May 29, 2008) (arrestee began fighting with officers and grabbed their badges); *Fultz v. Whittaker*, 187 F. Supp. 2d 695, 703 (W.D. Ky. 2001) (person took an aggressive posture, yelled at the officers, and tried to punch one). Still, verbal threats alone may compose the underpinning for probable cause to arrest for menacing. *See Tunne v. Paducah Police Dept.*, No. 5:08–CV–00188–JHM, 2011 WL 1810521 (W.D. Ky. May 11, 2011) (probable cause for menacing existed when man ran up to woman screaming and cursing).

Accepting Phillip's recollection, the minimal aggressive behavior he displayed does not comport with the hallmarks of criminal menacing. He did not run up to Brian – he took one step in his direction. He did not scream and yell his comment – his tone of voice was non-threatening. He did not touch Brian or make a gesture toward him – he took hold of his father in an attempt to balance him. The sum of these actions cannot be categorized as hostile and are incapable of instilling fear of injury.

Phillip's physical immaturity and status as a minor are also important considerations for judging his arrest for menacing. As Brian is the individual who is claiming to have had an "apprehension of imminent physical injury," the Court must necessarily consider the reasonableness of that fear. Not only was Phillip a minor, but photographic exhibits indicate he was not particularly large in stature. DN 28-2; DN 28-3; DN 28-4. This wrinkle begets the controlling question – could an officer reasonably believe that enough probable cause existed to arrest a physically unassuming 17 year-old-boy for menacing when he stepped forward to catch his father and told the officer to get out of his house? The Court thinks not. Taking the non-movant's facts, Phillip's arrest was not supported by probable cause, and because menacing

17

takes antagonistic behavior focused at another person, the Court finds that the law is clearly established.

Under Kentucky law, a person is guilty of resisting arrest when "when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest."  KRS § 520.090(1).  The subject must interfere with the arrest by either "[u]sing or threatening to use physical force or violence against the peace officer" or "[u]sing any other means creating a substantial risk of causing physical injury to the peace officer."  *Id*. § 520.090(1)(a)-(b).  The statute includes the following commentary:

> The offense of resisting arrest includes only forcible resistance and excludes other forms of nonsubmission to authority.  Neither flight from arrest nor passive resistance are punishable under this section since a peace officer has the available remedy of use of reasonable force to effect the arrest.  Criminal sanctions are, therefore, needed only when interference with arrest poses a direct threat to the safety of the officer or of another person.

*Id.,* § 520.090, cmt. Ky. Crime Comm'n.

The resisting arrest charge for Phillip emanates from his decision to stand up after he was thrown to the ground.  The Martins affirm that almost as soon as Phillip stood up, Brian drew his weapon.  They are equally resolute that Phillip quickly acceded to Brian's demand to get on the ground.  This rapid succession of events – Phillip standing up, Brian ordering him to lie down, and Phillip going prone – underscores that Phillip could not have interfered with his arrest or put Brian at risk of injury.  Under these facts, a police officer acting reasonably could not find probable cause to arrest.

For hindering prosecution or apprehension in the second degree, an arrestee must intend "to hinder the apprehension, prosecution, conviction or punishment of another who is being sought in connection with the commission of a criminal offense, he renders assistance to such

person."  KRS § 520.130(1).  "Rendering assistance" includes preventing or obstructing "by means of force, deception or intimidation, anyone from performing an act that might aid in the discovery or apprehension of such person."  *Id*. § 520.110(d).

Brian declares probable cause existed to arrest Phillip under this provision, as ordering him to leave the house and taking hold of John were a "means of force" and "intimidation" intended to subvert a legitimate investigation.  Yet, the offense of hindering prosecution or apprehension is inapplicable to the current facts.  Sections 520.110, 520.120, and 520.130 of Kentucky's criminal code represent "the statutory corollary to the common law theory of accessory after the fact."  *Id*. § 520.110, cmt. Ky. Crime Comm'n.  "[T]he offense of hindering prosecution or apprehension concerns events occurring after, and thus separately from, the commission of another predicate crime."  *Turpin v. Kassulke*, 26 F.3d 1392, 1402 (6th Cir. 1994) (citing KRS § 520.120).  Charges brought pursuant to §§ 520.120 and 520.130 usually originate in the context of providing aid or shelter to a criminal whose offense has already occurred.  *See Butts v. City of Bowling Green*, 374 F. Supp. 2d 532 (W.D. Ky. 2005) (mother transported son previously charged with rape); *Commonwealth v. Neal*, 84 S.W.3d 920, 922 (Ky. Ct. App. 2002) (defendant hid criminal suspect in his home).

Presuming the predicate offense Phillip interfered with was John's crime of menacing, Phillip's and John's criminal acts transpired at the same time.  *Turpin* indicates that § 520.130 was not meant to apply in such circumstances, outlining the need for a predicate offense and a later act to thwart the police investigation.  Alternatively, if the criminal investigation that Phillip interrupted was Brian's attempt to question John about harassment and stalking, these were not *completed* criminal offenses.  Brian admits no probable cause ever existed for these arrests.

19

Thus, John was not being sought in "connection with the commission of criminal offense," because when Brian reached through the door and Phillip allegedly interfered, Brian did not even know if a crime had been committed. Without an underlying offense, Phillip could not "render assistance" with the meaning of KRS § 520.130(1).

Furthermore, as Phillip describes the scene, his actions were not forcible acts of intimidation to hinder Brian's apprehension of John. Steadying a falling man and telling a police officer to leave your home are not a "means of force" or a mode of "intimidation" capable of creating a reason to arrest under KRS § 520.130. As probable cause cannot exist under Phillip's version of events and the law is reasonably clear, Brian is not entitled to qualified immunity.

John was arrested for menacing, resisting arrest, and for having a prescription drug out of its proper container. Taking the facts in John's favor, the charges for menacing and resisting arrest were without probable cause. John's attempts to speak with Hannah, his reentry of the house, and an unconfirmed suspicion that John was a drug dealer are the foundation for his menacing charge. The aggregate of these acts is insufficient for summary judgment. The conversations between John and each of the Coyts lasted for only a few minutes and, according to several parties, John was not confrontational. Although he stated he was going to sue Hannah, invoking one's right to pursue legal action is hardly sufficient to create the threat of "imminent physical injury." Brian says John's reentry of his home made him concerned for his personal safety but fails to present any real basis for his fear. Lastly, to the extent Brian believed John was a "drug dealer," no objective proof has been offered to support this suspicion.[4]

---

[4] In their affidavit attached to the motion for summary judgment, the Coyts allude to their beliefs that John was a drug dealer. There is no basis for this suspicion in the record and Brian does not offer any documents from local law enforcement that would corroborate the Coyts' speculation.

With his facts, John's charge of resisting arrest also lacked probable cause.  The Martins stopped moving once Brian pulled his weapon.  Neither attempted to escape, used physical force against Brian, nor intentionally resisted the orders to lie down.  John explained at gunpoint that he had an artificial knee and could not get on the ground.  Though technically non-compliant, "the offense of resisting arrest includes only forcible resistance."  KRS § 520.090, cmt. Ky. Crime Comm'n.  An officer could not reasonably conclude John resisted arrest by not going to the ground when a medical condition prevented him from doing so.

For John's final charge, KRS § 218A.210(1) criminalizes when "[a] person to whom or for whose use any controlled substance has been prescribed, sold, or dispensed, by a practitioner or other person authorized under this chapter, [does not] possess it only in the container in which it was delivered to him by the person selling or dispensing the same."  At his deposition, John admitted to having a prescription pill on his person out of its original container.

Notwithstanding the issues with John's arrest for menacing and resisting arrest, probable cause existed under KRS § 218A.210(1).  The Supreme Court has held that where the police have probable cause to arrest on a crime, claims for false arrest are barred on any of the other charges cited at the time of arrest, however illegitimate.  *Devenpeck v. Alford,* 543 U.S. 146, 153-55 (2004).  The offense cited by the arresting officer need not even be closely related to the offense for which probable cause is established.  *Id.*  Thus, that probable cause existed for any offense immunizes the arrest from possible flaws with the other two criminal charges.  *See Cain v. Irvin*, 286 F. App'x 920, 925 (6th Cir. 2008) (where alternative basis for arrest existed under KRS § 218A.210(1), summary judgment was proper on false arrest claims).

21

That the discovery of the prescription medication could have arisen out of a possible constitutional violation is also immaterial to the Court's analysis, since the Fourth Amendment's exclusionary rule does not apply to § 1983 proceedings.  *See Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999); *Padilla v. Miller,* 143 F. Supp. 2d 479 (M.D. Pa. 2001); *Clynch v. Chapman,* 285 F. Supp. 2d 213, 225 (D. Conn. 2003); *Cobb v. City of Columbus*, No. C-2-99-579, 2000 WL 1621091 (S.D. Ohio Oct. 20, 2000).  Accordingly, the lack of probable cause to initially arrest and the search of John would not vitiate Brian's discovery of the pill and the legitimate probable cause to arrest under KRS § 218A.210(1).

There are at least three versions of the scuffle in the doorway between Brian and the Martins.  These competing accounts must be sorted out by a jury.  For foregoing reasons, summary judgment is hereby GRANTED with regard to John's false arrest claims but DENIED for Phillip's false arrest claims.

### 3.  Excessive force against the Martins

"*[A]ll* claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor,* 490 U.S. 386, 395 (1989) (emphasis in original).  "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.* at 396.  However, the application of the reasonableness standard requires a particularized inquiry into the totality of the circumstances, including a consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court's analysis must

take into account that "police officers are often forced to make split-second judgments - in

circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is

necessary in a particular situation." *Id.* at 396-97.

Taking the facts in the light most favorable to the Martins, a finder of fact could conclude

Brian used excessive force when he threw Phillip down the stairs, pointed his weapon at the

Martins, knocked John to the ground, and dragged John across the yard while handcuffed.[5] The

crimes Brian suspected the Martins of and arrested them for were all misdemeanors. Neither

displayed overly aggressive behavior toward Brian, save Phillip's comment that he should vacate

the house. This lone remark to "get out" may have been sufficient to prompt some reaction from

Brian, but taking a seventeen-year-old boy and pitching him out the front door and down the

stairs can certainly be characterized as an excessive response. *See Meirthew v. Amore*, 417 F.

App'x 494, 498 (6th Cir. 2011) (even where some force was justified, the amount of force

utilized must be reasonable). Moreover, Brian's physical response was overborn because

voicing objections to an officer's illegal entry into a residence qualifies as "inconsequential"

resistance on Phillip's part. *See Rohrbough v. Hall,* 586 F.3d 582, 586 (8th Cir. 2009) (officers

may not use substantial use of force to combat "*de minimis* or inconsequential" resistance).

Drawing his weapon and pointing it at the Martins may comprise a claim of excessive

force. *See Croom v. Balkwill*, 645 F.3d 1240, 1253 n. 17 (11th Cir. 2011) ("An officer's decision

to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public

can certainly sustain a claim of excessive force."). The Martins did not resist arrest or attempt to

---

[5] Brian's threats to kill the Martins are not cognizable since verbal threats by police officers do not trigger the Fourth Amendment's prohibitions on excessive force. *Williams v. Sandel*, 433 F. App'x 353, 362-63 (6th Cir. 2011) (citations omitted).

23

evade capture, and neither made any furtive movements that could be construed as threatening or hostile.  Though Brian belabors Phillip's decision to stand up once he landed in the yard, the Martins indicate Brian never ordered him to go prone until after he drew his weapon.  In sum, a jury could reason that Brian had no verifiable basis to aim his weapon at the Martins.

Brian's decision to knock John to the ground and then drag him across the yard creates a material fact for an excessive force claim as well.  "Cases in [the Sixth Circuit] clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."  *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006).  The evidence taken in the Martins' favor shows John had his hands raised, was not resisting, and was attempting to explain the medical condition that prevented him from lying down.  He was not a threat to Brian's safety.  Thus, striking John and causing him to fall to the ground could be seen as gratuitous and unnecessary.  *See Miller v. Sanilac Cnty.,* 606 F.3d 240, 253 (6th Cir. 2010) (where offense was non-violent and arrestee posed no immediate safety threat, jury was entitled to hear excessive force claim where plaintiff was slammed against vehicle and kicked his feet apart during a traffic stop).  Dragging John across the yard in handcuffs was also unwarranted since he was already under Brian's control.  *See Harris v. City of Circleville,* 583 F.3d 356, 366 (6th Cir. 2009) (plaintiff "did not pose an immediate threat" when she was handcuffed and surrounded by officers).

As a last resort, Brian proposes dismissal because the Martins did not suffer lasting injuries.  However, physical injuries are not necessary to pursue a claim of excessive force under the Fourth Amendment.  *See Marcilis v. Redford Tp.*, 757 F. Supp. 2d 663, 674 (E.D. Mich. 2010) (actual physical injury unnecessary for excessive force claim).

24

Nowhere in the Martins' version of events is the indication that they resisted or threatened Brian so as to justify the abuse they allegedly endured.  As the material facts give rise to a jury issue and the law on excessive force is clearly established, summary judgment is DENIED.

    B.  <u>Fourteenth and Eighth Amendments</u>

In Counts Two and Three of their complaint, the Martins bring claims according to their substantive due process rights under the Fourteenth Amendment and the Eighth Amendment's prohibitions against cruel and unusual punishment.  Compl. ¶¶ 35-40, DN 1-1.  Both counts are defective.  Claims of substantive due process against law enforcement officers are only cognizable inasmuch as the factual underpinnings occur after a probable cause hearing.  *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010).  The Eighth Amendment protects convicted criminals from cruel and unusual punishment, not arrestees like the Martins.  *Id*.  These theories are legally deficient and summary judgment is hereby GRANTED.

**II. State-law torts**

The Martins cite a host of state-law torts, including assault, battery, outrage, false arrest, and malicious prosecution.  Brian responds that he is officially immune from suit under Kentucky law.  "Official immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions."  *Yanero v. Davis,* 65 S.W.3d 510, 521 (Ky. 2001).  "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, (2) in good faith, and (3) within the scope of the employee's authority."  *Id.* at 522 (internal citations omitted).

Brian's actions were undoubtedly discretionary acts taken within the scope of his authority as a police officer. Thus, the Martins must establish that such actions were not "in good faith." *See Woosley v. City of Paris,* 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). "Bad faith exists if either a public employee violated a constitutional, statutory, or other clearly established right of which a reasonable person would have known or if the public employee 'willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.'" *Id.* (quoting *Yanero,* 65 S.W.3d at 523); *accord King v. Taylor*, 803 F. Supp. 2d 659, 684 (E.D. Ky. 2011) (bad faith can be predicated on a violation of a clearly established constitutional right).

### A. Assault and Battery

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch,* 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). With claims for assault and battery, "the focus is on whether the police officer had reasonable grounds to believe and did believe in good faith that the plaintiff had committed an arrestable offense, and whether the officer used excessive force in making the arrest." *Dunn v. Felty*, No. 2004-CA-001029-MR, 2005 WL 736596, at *2 (Ky. Ct. App. Apr. 1, 2005). The Court has already determined material facts exist as to whether Brian violated the Martin's constitutional rights with regard to their excessive force and false arrest claims. Where summary judgment is denied on constitutional theories brought under § 1983, claims of official immunity under *Yanero* and its progeny fail as well. *See Toon v. City of Hopkinsville*, No. 5:09–CV–37, 2011 WL 1560590 (W.D. Ky. Apr. 14, 2011). The claims of assault and battery are ripe for jury review and summary judgment is DENIED.

### B. Outrage

26

The Martins brings a claim of outrage against Brian. However, under Kentucky law, the tort of outrage is a "gap-filler," which provides a remedy to a plaintiff only when no other tort is available. *Rigazio v. Archdiocese of Louisville,* 853 S.W.2d 295, 299 (Ky. Ct. App. 1993). When the torts of assault, battery and/or negligence are available to a plaintiff, a claim of outrage is precluded. *Id.* With these and other legal theories at the Martins' disposal, the outrage claim fails as a matter of law.

    C.  <u>False Arrest</u>

There is no distinction between claims of false arrest and false imprisonment under Kentucky law. *Lexington-Fayette Urban County Government v. Middleton,* 555 S.W.2d 613, 619 (1977). "[A]n action for false arrest may only be maintained when the arrest is without legal authority." *Young v. City of Radcliff,* 561 F. Supp. 2d 767, 793 (W.D. Ky. 2008). Given the earlier conclusions on the constitutional claims of false arrest, summary judgment is GRANTED on John's claims and DENIED for those pertaining to Phillip.

    D.  <u>Malicious Prosecution</u>

For the tort of malicious prosecution, plaintiffs must establish six elements to succeed:

> (1) the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings, (2) by, or at the instance, of the defendant, (3) the termination of such proceedings in defendant's favor, (4) malice in the institution of such proceeding, (5) want or lack of probable cause for the proceeding, and (6) the suffering of damage as a result of the proceeding.

*Raine v. Drasin,* 621 S.W.2d 895, 899 (Ky. 1981). Kentucky law is historically antagonistic toward allegations of malicious prosecution "due to the chilling effect [it has] on those considering reporting a crime." *Broaddus v. Campbell*, 911 S.W.2d 281, 285 (Ky. Ct. App. 1995) (citing *Reid v. True*, 302 S.W.2d 846 (Ky. 1957)). Its elements are therefore strictly

construed.  *Davidson v. Castner-Knott Dry Goods Co.,* 202 S.W.3d 597, 602 (Ky. Ct. App. 2006) (citing *Prewitt v. Sexton,* 777 S.W.2d 891, 895 (Ky. 1989)).

Brian urges dismissal because the criminal charges against the Martins were supported by probable cause.  "It is well established in Kentucky that a necessary element to the claim of malicious prosecution is that the defendant lacked probable cause for the proceedings in question."  *Howell v. Sanders*, 755 F. Supp. 2d 789, 799 (E.D. Ky. 2010) (citations omitted). Criminal charges supported by probable cause are an inadequate foundation for a malicious prosecution claim.  *See e.g.*, *D'Angelo v. Mussler,* 290 S.W.3d 75, 79 (Ky. Ct. App. 2009); *Collins v. Williams,* 10 S.W.3d 493, 496 (Ky. Ct. App. 1999).

Based on the non-movants facts, the only charge supported by probable cause was John's arrest under KRS § 218A.210(1).  Still, this finding of probable cause does not inoculate the other faulty criminal charges for the purposes of malicious prosecution.  *See Mabie v. Hyatt*, 71 Cal. Rptr. 2d 657, 665 (Cal. Ct. App. 1998) ("[O]ne reasonable ground [for a suit] will not excuse others which are without probable cause." (citations omitted)); *see also* 52 Am. Jur. 2d *Malicious Prosecution* § 52 (1970).  The remaining criminal counts against the Martins act as separate bases for recovery for this tort.

Brian says the Martins have not made an adequate showing of malice.  Under Kentucky law, "malice is the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose."  *Stearns Coal Co. v. Johnson*, 37 S.W.2d 38, 40-41 (Ky. 1931) (citations omitted).  The question of malice is one for the jury.  *Id.*  The absence of probable cause may create the inference of malice but it does not warrant a presumption of malice.  *Miller v. Jefferson Cnty. Police Dept.,* 569 S.W.2d 189, 191 (Ky. Ct. App. 1978).

28

The Court cannot preclude that a reasonable jury could make a finding of malice.  Brian's aim for confronting the Martins could reasonably be seen as motivated by a series of perceived slights to his wife.  Witness testimony shows Brian was agitated and hostile during the encounter, and the prosecutor criticized his on-the-scene probable cause determination.  This proof could lead a jury to believe Brian premised the criminal charges on his anger rather than the Martins' alleged criminal behavior.  As the remaining elements for malicious prosecution are sufficiently supported by the record, Brian's request for summary judgment is DENIED.

## CONCLUSION

Overall, the remarkably different stories advanced by the parties mandates review by a finder of fact.  For the aforementioned reasons, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.