UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:10-CV-00176-R

JOHN MARTIN and P.M.
by and through his next friend
JOHN MARTIN                                                      Plaintiffs

v.

BRIAN COYT                                                        Defendant

MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Reconsideration (Docket No. 43).  The

Plaintiffs have responded (Docket No. 49) and Defendant has replied (Docket No. 54).  This

matter is now ripe for adjudication.  For the reasons that follow, Defendant's motion is DENIED.

BACKGROUND

The facts of this matter are more thoroughly discussed in the Court's previous

Memorandum Opinion and Order of May 3, 2012.  (Docket No. 38.)  Still, the Court recounts the

relevant facts to address the parties' arguments.  Because the Court reviews Plaintiffs' legal

claims in the context of Defendant's summary judgment motion, the facts are presented in the

light most favorable to Plaintiffs.

A.  Factual Background

This matter arises out of several altercations between the members of two families Brian

and Hannah Coyt ("Brian" and "Hannah" or collectively the "Coyts"), and John and Phillip

Martin ("John" and "Phillip" or collectively the "Martins").  On September 17, 2010, a near

traffic accident and series of interactions between these individuals culminated in the arrests of

John and Phillip by Brian, then a trooper with the Kentucky State Police.  Stemming from these arrests, the Martins brought suit against Brian.

The interactions between the parties can be divided into five separate incidents:

1.  Incident One: On September 17, 2010, the Martins were in the process of moving furniture between their residence ("Martin Residence") and another house.  While the Martins drove along Tucker Warren Road in a two-car caravan, a white Ford Expedition driven by Hannah and traveling the opposite direction encroached on their side of the road.  It forced one of the vehicles in which the Martins were traveling to drive onto the shoulder to avoid a collision.  Hannah continued on without stopping.  The vehicles did not make contact and no one was hurt in this near accident.  Believing Hannah was leaving the scene of a traffic accident, John turned his vehicle around to pursue the white Ford Expedition.

2.  Incident Two: After searching for the car, John saw the white Ford Expedition parked in front of the Coyts' residence.  John stopped his vehicle in the road in front of the house, prompting Brian to come outside and approach the vehicle.  The two men spoke about the near miss on Tucker Warren Road and Brian informed John that no traffic accident could have occurred because there had been no contact between the vehicles.  John accepted this explanation and drove away.

3.  Incident Three: Later in the day, Hannah gathered two of her children to take them to her mother's house where she was meeting her ex-husband for a scheduled visitation.  During transit in the Ford Expedition, Hannah passed the Martin Residence where John and several men were gathered in the yard.  She claims that as she drove by,

John waved his arms at her and yelled "come back here bitch."  The Martins refute that this incident of roadside heckling took place but have not included affidavits or deposition testimony to corroborate these denials.

4. <u>Incident Four</u>: Shortly after Hannah arrived at her mother's house, the Martins drove up and stopped in the road nearby.  Hannah and John engaged in a verbal altercation about the near collision.  There are divergent accounts from Hannah, the Martins, and two witnesses on the specifics of the argument, but the entire episode lasted two or three minutes.  The Martins drove away without ever having left their vehicle but did tell Hannah that they would "see her in court."

   After speaking with Hannah about this episode, Brian claims that he had reasonable suspicion pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), that John's actions constituted either second degree stalking or second degree harassment under Kentucky law.  He then drove to the Martin Residence with the intention of asking John some questions.  Brian was not in uniform but had his service weapon on his belt.

5. <u>Incident Five</u>: Brian drove down the driveway of the Martin Residence and parked roughly 25 feet away from the house.  The Martins were standing on or near the front steps, having been drawn to the front door area by the presence of Brian's police cruiser.  (Phillip Dep., Docket No. 28-1, at 23 ("We had come to the door at the same time he was getting out of the car because I seen [sic] that somebody was coming down the driveway.")).  At the time Brian pulled up, John was speaking on the phone with Officer Joey Burress of the Adair County Sheriff's Department.

After Brian emerged from his cruiser, the Martins claim he started "coming at them," all the while asking why John had spoken with his wife and stressing there had been no traffic accident.  Brian also remarked that he wanted to "take John around back," which John interpreted to mean Brian wanted to physically harm him.  (John Dep., Docket No. 27-5, at 11; Phillip Dep., Docket No. 28-1, at 24.)  It was apparent to the Martins that Brian was very angry.  (John Dep., Docket No. 27-5, at 9-10; Phillip Dep., Docket No. 28-1, at 24.)

After a few moments of Brian asking questions, John told Brian he could not continue to stand there and argue.  Still on the phone, John asked Officer Burress if he and Phillip could go back inside the house.  Burress assented, and John told Brian that he and his son were returning to the house.  The Martins do not remember Brian ordering them to stay outside.

The Martins turned and crossed the threshold into the house.  (John Dep., Docket No. 27-5, at 12; Phillip Dep., Docket No. 28-1, at 25, Docket No. 28-2, at 1.) John then proceeded to close the door behind him.  (John Dep.., Docket No. 27-5, at 12; Phillip Dep., Docket No. 28-1, at 25, Docket No. 28-2, at 1.)  Whether the door was completely closed or nearly closed is unclear from the Martins' testimony.  (*See* John Dep.., Docket No. 27-5, at 12; Phillip Dep., Docket No. 28-1, at 25, Docket No. 28-2, at 1.)  The Martins agree however that Brian responded by "kicking" the door open, taking hold John's arm, and pulling him back outside.  Neither party disputes that the Martins were across the threshold of the doorway, inside the home, with the door closing behind them when Brian seized John.

4

Officer Burress corroborates much of Martins' account from the sounds that he heard through the phone's receiver. He states that Brian sounded angry and that he heard what sounded like someone kicking in a door. (Burress Dep., Docket No. 28-6, at 6.)

## B.  The Court's Prior Ruling

In this lawsuit, the Martins pursue violations of their constitutional rights under the Fourth Amendment pursuant to 42 U.S.C. § 1983. One of their constitutional claims centers on Brian's entry through the Martins' doorway and the seizure of John in his abode. They argue that Brian made a warrantless entry of their home when he kicked the door open and reached across the threshold to grab John. They further state that the seizure of John was unconstitutional because no probable cause existed and the police may not detain an individual inside his home on the basis of reasonable suspicion.

In its previous ruling, the Court divided this claim into three inquiries: Where was John when Brian seized him, was John afforded the Fourth Amendment's expectation of privacy after he stepped back into his house, and did probable cause or an exigency exist that would permit Brian to enter the Martin Residence and seize John? (Mem. Op. & Order, Docket No. 38, at 10.) The parties agreed on two of these questions. Both parties conceded that Brian entered the house to some degree when he reached across the threshold to grab John. (*See* Coyt Aff., Docket No. 27-2, at 10.) Brian also admitted that at the time he took hold of John, he possessed only reasonable suspicion that John had either stalked or harassed Hannah in the second degree. (Coyt Aff., Docket No. 27-2, at 10.) The true point of contention between the parties was whether John was due a reasonable expectation of privacy just inside the entrance of his house.

5

Brian proposed that the Fourth Amendment permitted him to perform an investigative stop pursuant to *Terry* regardless of John's location.

After acknowledging that the principal evil the Fourth Amendment protects against is the warrantless, physical entry of the home, *see Payton v. New York,* 445 U.S. 573, 585 (1980), the Court addressed three cases where the Sixth Circuit evaluated confrontations between police officers and civilians at or near a home's entrance: *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), *Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005), and *Denton v. Rievley*, 353 F. App'x 1 (6th Cir. 2009).  Each confronted situations where officers seized and arrested individuals who were in their doorways or just within their residences.  The appellate court found in those matters either (1) that the police officers violated the Fourth Amendment's prohibition against crossing into a residence and seizing the detainee or (2) that evidence of such a violation existed sufficient to defeat a motion for summary judgment.

In its previous decision in this matter, the Court found *Saari* particularly persuasive. There, the government argued that the seizure of an occupant at gunpoint in his doorway was not an arrest but instead an investigatory stop.  272 F.3d at 809.  The Sixth Circuit disagreed and found that police had arrested the defendant upon exiting his house, but nonetheless rejected the government's argument that *Terry* permitted investigatory stops in the home.  Such a result, the court reasoned, "would have the effect of providing lesser protection to individuals in their homes when the police do not have probable cause to arrest."  *Id*.  The appellate court further emphasized that the proposed expansion of *Terry* would have the illogical result of permitting a "warrantless in-home seizure . . . to further an investigation" but still require "a warrant or exigent circumstances . . . when officers have the probable cause and intent to arrest."  *Id*.

6

Ultimately, *Saari* upheld the principle that "warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, [and this protection] applies . . . regardless of whether the officers at issue were conducting an arrest or an investigatory detention."  *Id*.

Though the Sixth Circuit did not affirmatively weigh in on the dispositive inquiry—whether the police may perform an investigative stop at or just inside the front door—the Court found *Saari*'s language persuasive.  Citing several other opinions which held that *Terry* stops were not permitted inside a home, the Court determined that John possessed a reasonable expectation of privacy inside his home and that the facts as alleged by the Plaintiffs described a constitutional violation sufficient to proceed to the jury.  (Mem. Op. & Order, Docket No. 38, at 12-15.)

## STANDARD

"District courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment."  *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008).  "A district court may modify, or even rescind, such interlocutory orders."  *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991).  However, because there is an interest in the finality of a decision, a court should grant motions for reconsideration sparingly, *Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1107 (E.D. Pa. 1992),  and "only if the prior decision appears clearly to be legally or factually erroneous,"  *Mobley v. Warden London Corr.l Inst.*, 2010 WL 3586964, at *2 (S.D. Ohio Sept. 13, 2010).  *Accord Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) ("Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.").

7

## DISCUSSION

In his motion for summary judgment, Brian centered his focus on whether he should be afforded qualified immunity.  The Court rejected his argument because, taking the facts in the light most favorable to the Martins, Brian's actions were not constitutionally permissible.

Brian now asks the Court to reconsider its decision in three respects.  First, he contends the Court incorrectly found that John possessed an expectation of privacy upon reentering the front door of his home.  Brian states that because John exposed himself to public view when he voluntarily exited his house, he did not regain the Fourth Amendment's protection when he crossed the threshold.  Second, Brian insists that even if an investigative stop under *Terry* is unconstitutional in these circumstances, this area of the law is not clearly established, which therefore entitles him to qualified immunity on this portion of the lawsuit.  Third, Brian analogizes the present matter to the recent decision of *Ryburn v. Huff*, 132 S.Ct. 987 (2012), where the Supreme Court found qualified immunity for police officers during the warrantless entry of a home in an emergency situation.  The Court divides its analysis along these lines.

### A.  John's Reasonable Expectation of Privacy

According to Brian, "John's presence outside of the home prior to his detainment and the fact that his door was not closed at the time of detainment have a profound impact on his expectation of privacy under the Fourth Amendment."  (Docket No. 43-1, at p. 4.)  He cites several different decisions where the police either pursued criminal suspects fleeing into a residence or temporarily seized a suspect at an entryway after a knock-and-talk encounter.  Brian contends that the aggregate of this legal precedent compels the Court to reevaluate its prior conclusions.

8

Brian initially points to *United States v. Santana*, 427 U.S. 38 (1976), where the Supreme Court addressed the warrantless entry into a residence in pursuit of a suspect who had sold drugs to an undercover officer.  In *Santana*, police encountered the suspect standing in the doorway to her home, whereupon she retreated inside.  They followed her in and arrested her in the vestibule of the residence.  The Supreme Court upheld the warrantless intrusion and arrest in part because the police encountered the suspect in the doorway, which the Court considered a public place, exposed to "public view, speech, hearing, and touch."  *Id.* at 40-42.  Brian compares the present matter to *Santana*, since Brian first encountered John outside John's house.  Because an arrest at the threshold is constitutionally condoned, Brian posits that a less intrusive investigatory detention in the same vicinity should meet with similar constitutional approval.

Decisions from at least two circuits outside the Sixth Circuit arguably support Brian's position: *United States v. Gori*, 230 F.3d 44 (2d Cir. 2000), and *United States v. Crapser*, 472 F.3d 1141 (9th Cir. 2007).  Both of these cases involved a confrontation between officers and citizens at the entryway of a residence during a knock-and-talk encounter, and both appellate courts upheld the constitutionality of a *Terry* seizure performed at or just past the doorway's threshold.

In *Gori*, a divided panel of the Second Circuit upheld a *Terry* stop at an apartment's entrance. 230 F.3d at 46.  There, the encounter occurred during police surveillance of an apartment believed to contain a large amount of cocaine.  When a pizza delivery woman arrived to make a delivery to the apartment in question, the officers decided to accompany her to the front door.  An occupant opened the front door and the officers forced him, along with the other occupants of the apartment, outside at gunpoint.  The Second Circuit upheld the actions of the

police under *Terry*, crediting their reaction to a "quickly developing situation." *Id*. at 47, 54. The court concluded that because the occupants of the apartment opened the front door in response to a knock, there was no expectation of privacy as to what could be seen from the hallway. *Id*. at 53. Accordingly, permitting police to order the occupant who answered the door to step outside was not a repudiation of *Payton*'s "firm line." *See id.* at 51 (discussing *Payton v. New York,* 445 U.S. 573, 585 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.")).

In *Crapser*, a divided panel of the Ninth Circuit reached a similar conclusion regarding the constitutionality of *Terry* stops at the threshold of an entryway. 472 F.3d at 1147-49. Again, police were investigating reports of drug activity—specifically, whether the occupants of a hotel room were manufacturing methamphetamine. Upon arriving at the hotel, the officers made contact with the suspect through the hotel room's window. The suspect agreed to exit the room at the officers' request and was confronted by five officers standing in the corridor when he opened the door. *Id*. at 1143-44. The officers then asked the suspect to step outside and speak with them a few feet away. After extended questioning, the officers obtained consent from the suspect to search the hotel room, at which point a number of incriminating items were discovered. *Id*. at 1145. The panel majority determined that even if the confrontation at the doorway constituted a detention under *Terry*, the officers' actions were not unconstitutional. In doing so, the Ninth Circuit parroted *Gori* by holding that where "a suspect voluntarily opens the door of his residence in response to a non-coercive 'knock and talk' request, the police may

temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity." *Id*. at 1148.

In his Motion for Reconsideration, Brian aggregates *Santana*, *Gori*, and *Crapser* for the proposition that John did not enjoy a reasonable expectation of privacy in the doorway to his residence. Instead, Brian argues that, read together, this trio of decisions confirms that the entryway is a public place where residents are not afforded any protection by the Fourth Amendment. Brian continues that *Gori* and *Crapser* support his argument that because the front door was not yet closed John was still publicly exposed and thus should not be afforded *Payton*'s protection. As such, the detention of John just over the threshold does not present a constitutional violation.

Brian's conclusions are not necessarily unhinged from this area of the law, as *Gori* and *Crapser* do endorse investigative stops in the doorway of a residence in some circumstances. And, taking the facts *in the light most favorable to Brian*, a colorable argument does exist that he did not violate John's constitutional rights. The Court may not, however, accept Brian's version for purposes of this motion. Instead, the Court must, in viewing the facts in a light most favorable to the Plaintiffs, presume that Brian arrived at the Martin Residence hostile and demanding answers about John's previous encounter with Brian's wife, Hannah. John decided to disengage from the conversation and retreat inside his home. John entered and proceeded to shut the door. The Martins are resolute that even if the door was not closed entirely, it was almost completely shut. (*Compare* John Dep.., Docket No. 27-5, at 12 ("All I remember is, when I walked up there and shut the door . . . ."), *with* Phillip Dep., Docket No. 28-2, at 1 ("[John] was in the process of getting it closed all the way, it was almost closed.")) Brian

11

responded by kicking open the door with such a force that it was audible to Officer Burress over the telephone.  (*See* Burress Depo., Docket No. 28-6, at 6.)

These facts preclude the finding of constitutionality that Brian seeks.  Even if *Gori* and *Crapser* are couched in terms of knock-and-talk encounters with the police, an individual does not "completely surrender or forfeit every reasonable expectation of privacy when he open[s] the door, including, most notably, the right to be secure within his home from a warrantless arrest." *McClish v. Nugent*, 483 F.3d 1231, 1247 (11th Cir. 2007) (citing *Hadley v. Williams*, 368 F.3d 747, 750 (7th Cir. 2004); *United States v. McCraw*, 920 F.2d 224, 228 (4th Cir. 1990); *Duncan v. Storie*, 869 F.2d 1100, 1103 (8th Cir. 1989)).  The fact that an officer may view certain parts of a home's interior or confront an individual in a doorway does not nullify the prohibition on warrantless entry into the home.  *See id*. at 1248.  Moreover, at the point Brian intruded over the threshold, John had "manifested his intent to keep the inside of his home private" by reentering his house and almost entirely shutting his door.  *See Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005).  John's positioning in the house and his attempt to seal off the outside world demonstrates that he was attempting to assert and reestablish his constitutional right of privacy. The Court cannot say that under the Martins' facts they should not be afforded a reasonable expectation of privacy.  *See id*. (finding that where the occupant of a building spoke to police through closed door, it was unconstitutional for officers to force door open and arrest him without warrant or exigent circumstances).

Furthermore, neither *Gori* nor *Crapser* indicates that police officers may force entry into a residence past a closing door in performing an investigative stop at the threshold.  The officers in those cases maintained their positions outside the doorway and directed the occupants to leave

12

the structures.  In light of the seriousness of the drug offenses for both cases, it is clear why the jurists of the Second and Ninth Circuits believed that the investigative methods employed were "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Florida v. Royer,* 460 U.S. 491, 500 (1983) (setting forth the standard for an investigative stop supported by reasonable suspicion).  The Court cannot draw the same conclusion while viewing the facts in the light most favorable to the Martins.  To do so would require the Court to find that the rulings in *Gori* and *Crapser* reach so far as to condone an officer kicking open a front door and pulling an occupant outside simply to further the investigation of two misdemeanor offenses that the officer never even witnessed.  Such an interpretation would be unacceptable because, as the Second Circuit noted in *Gori*, "'[T]he touchstone of [the] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'"  230 F.3d at 54 (quoting *Maryland v. Wilson,* 519 U.S. 408, 411 (1997)).  Accordingly, only an unreasonable (and incorrect) application of the Fourth Amendment could justify Brian's alleged actions through the lens of *Gori* and *Crapser*.

A viable issue of fact thus prevents a summary judgment ruling in Brian's favor.  A colorable argument does exist that if the events occurred as Brian describes them, the legal reverberations of *Santana*, *Gori*, and *Crapser* might immunize his behavior against a Fourth Amendment violation.  Nevertheless, judging from the Martins' perspective, a reasoned understanding of these cases does not permit the Court to hold that Brian's actions were constitutionally permissible.  This issue must proceed to a finder of fact to determine the precise course of events.  Only from there can the constitutionality of Brian's behavior can be measured.

13

**B.  Brian Is Not Entitled to Qualified Immunity**

In the alternative, Brian claims that he should be afforded qualified immunity because the law governing *Terry* stops in the threshold of an entryway is not clearly defined.  In support of this argument, he cites to both *Gori* and *Crapser*, as well as the Sixth Circuit's decision to not address the subject in *Saari*.

Qualified immunity shields government officials from civil liability for discretionary functions, "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "'The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed.'"  *Denton v. Rievley*, 353 F. App'x 1, 4 (6th Cir. 2009) (quoting *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995)).

The Sixth Circuit has established a three-step inquiry for analyzing whether a defendant is entitled to qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). Although the sequence of this inquiry is no longer mandatory, *Pearson*, 555 U.S. at 235-36, the Court will address the three steps in roughly the order outlined above.

      1.     <u>Under the Facts Alleged, Brian Violated the Martins' Constitutional Rights</u>

First, we ask whether, under the facts alleged by the Plaintiffs, a constitutional violation occurred. The Supreme Court and this circuit have long recognized as a basic tenet of Fourth Amendment law that warrantless seizures inside the home are presumptively unreasonable. *E.g.*, *Payton v. New York*, 445 U.S. 573, 586 (1980); *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005). Despite the Second Circuit's holding in *Gori* and Ninth Circuit's in *Crasper*, the Sixth Circuit has expressly and consistently read *Payton* as establishing a "firm line" at the entrance to the home. *See, e.g.*, *Denton*, 353 F. App'x at 4-5; *United States v. Thomas*, 430 F.3d 274, 276 (6th Cir. 2005); *United States v. Saari*, 272 F.3d 804, 805 (6th Cir. 2001). In that vein, the Sixth Circuit recognizes an expectation of privacy for Fourth Amendment purposes where an individual manifests the intent either not to expose himself to the public view or to remove himself therefrom. *See Cummings*, 418 F.3d at 685 (finding that a claimant who only partially opened the front door to speak to police and then attempted to close the door and end the conversation manifested an intent to maintain his expectation of privacy in his home).

The facts alleged by the Martins show that John manifested his intent to keep the inside of his home private by reentering and attempting to close the front door to his home. Like the claimant in *Cummings* whose "attempt to close the door constituted a termination of the consensual encounter, and communicated his lack of consent to any further intrusion by the

[police]," John manifested an expectation of privacy in his home and the intent to remove himself from exposure to the public view. 418 F.3d at 685. Accordingly, the facts, when viewed in the light most favorable to the Martins, support the conclusion that Brian violated the Martins' constitutional rights.

2.      The Constitutional Right Violated Was Clearly Established

The next inquiry is "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Merriweather*, 569 F.3d at 315. To determine whether a right was clearly established, the Court "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Id.* (citing *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994)). "Clearly established" does not require that there have been a case "with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendant[] had 'fair warning' that [his] actions were unconstitutional." *Cummings*, 418 F.3d at 687 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *cf. United States v. Lanier*, 520 U.S. 259, 271 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] been held unlawful." (second alteration in original) (internal quotation marks omitted)). Thus, two routes exist for a § 1983 plaintiff to demonstrate that a right was clearly established: "A plaintiff may establish that a violation 'was sufficiently obvious under the general standard of constitutional care that the plaintiff need not show a body of materially similar case law' or prove that an officer 'failed to adhere to a particularized body of

precedent that squarely governs the case.'" *Garcia v. Dykstra*, 260 F. App'x 887, 899 (6th Cir. 2008) (quoting *Lyons v. City of Xenia,* 417 F.3d 565, 579 (6th Cir. 2005)).

Considering the silence of the Sixth Circuit and the divergent opinions of the other circuits on *Terry* stops at the entryway of a residence, the Court finds that no particularized body of precedent squarely governs this case.[1]   However, regarding the former approach—that a violation is sufficiently obvious under general standards of constitutional care—the Court is persuaded that the kicking in of a door to perform an investigative stop would be an obvious deviation from the generalized standard of constitutional care.   This conclusion is buoyed in no small part by the steadfast constitutional prohibition against unreasonable intrusions into residences.   Cases abound confirming that a violation of the Fourth Amendment occurs when officers enter a home and arrest or seize its occupant without a warrant or probable cause and an exigency.   *See, e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984); *United States v. United States District Court*, 407 U.S. 297, 313 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971); *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007); *United States v. Reed,* 572 F.2d 412, 422–23 (2d Cir. 1978); *United States v. Herrold,* 772 F. Supp. 1483, 1489-90 (M.D. Pa. 1991).   While Brian attempts to draw parallels with *Gori* and *Crapser*, he is alleged to have done more than just seize John in the doorway—rather, that he prevented John from shutting the door and reached into the home to extract him.   The law is sufficiently clear for Brian to recognize that he could not kick open a closing door and detain the occupant of house on reasonable suspicion alone.   *Cf. Cummings*, 418 F.3d at 676 (police pushing past closing door violated occupant's constitutional rights); *United States v. Berkowitz,* 927 F.2d 1376, 1388 (7th

---

[1] To the extent the parties disagree with this characterization, the Court notes that despite its best efforts, it has failed to locate a decision in the vein of *Gori* and *Crapser* that has permitted a police officer to forcefully open a door and seize an individual to perform an investigative stop under *Terry*.

Cir. 1991) ("*Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance."); *United States v. McCraw,* 920 F.2d 224 (4th Cir. 1990) (determining that a person does not surrender his expectation of privacy by partially opening the door).

Furthermore, both the Sixth and its sister circuits have repeatedly admonished police officers, as a matter of general policy, not to effect warrantless in-home arrests for misdemeanors absent consent or an exigency. *See, e.g.*, *Denton*, 353 F. App'x at 6 (6th Cir. 2009) ("*Payton* and *Atwater* [*v. City of Lago Vista*, 532 U.S. 318 (2001)]*,* taken together, clearly establish that warrantless in-home arrests for misdemeanor offenses absent consent or exigency violate the Fourth Amendment.") (citations omitted); *Mascorro v. Billings*, 656 F.3d 1198, 1207 (10th Cir. 2011) (finding a constitutional violation where officers entered residence without a warrant to effect a misdemeanor arrest); *United States v. Johnson*, 256 F.3d 895, 908 n. 6 (9th Cir. 2001) ("[I]n situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." (quoting *Welsh*, 466 U.S. at 753)); *LaLonde v. Cnty. of Riverside,* 204 F.3d 947, 956 (9th Cir. 2000) ("[A]n exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home."). These decisions herald the sufficiently obvious principle that warrantless intrusions into the home to detain an occupant are only proper, if ever, when the criminal offense is of a serious nature. *See Welsh*, 466 U.S. at 753 ("[W]e note that it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor."). Here, Brian asserts that he had reasonable suspicion that John's actions constituted either harassment or stalking in the second degree—both misdemeanors under Kentucky law. *See* Ky. Rev. Stat. §§ 508.150, 525.070. As such, the law is sufficiently clear to

have given Brian notice of the impermissibility of a warrantless intrusion into a home, founded simply on a reasonable suspicion that a misdemeanor had been committed.

> 3.    Brian's Conduct was Objectively Unreasonable

Finally, the Court is satisfied that the Martins have offered sufficient evidence to suggest that Brian's alleged conduct was objectively unreasonable in light of established constitutional rights.   That is, under the Martins' version of the facts, it is not an objectively reasonable exercise of police power under *Terry* to kick open the door to a residence and extract an individual from within in order to investigate a misdemeanor.

The Sixth Circuit employs a two-part analysis for evaluating the reasonableness of an investigatory *Terry* stop: "'We ask first whether there was a proper basis for the stop' and, if the stop was proper, "then we must determine whether the degree of intrusion . . . was reasonable related in scope to the situation at hand.'"   *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)).   The permissible scope of an investigatory stop depends on the circumstances that originally justified the stop. *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002).   Thus, in the second part of this analysis, the Court must determine "whether the degree of intrusion, 'was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the official['s] conduct given [his] suspicions and the surrounding circumstances.'"   *Id.* at 537 (quoting *Caruthers*, 458 F.3d at 464, 468).   Or, stated differently, "(1) was [the stop] sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available."   *Caruthers*, 458 F.3d at 468 (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)).

These considerations disabuse the Court of the notion that Brian's detention of John was a reasonable extension of *Terry*.   Assuming Brian had a reasonable suspicion to perform an investigatory stop, his investigative methods cannot be characterized as "the least intrusive means reasonably available."   It follows that the degree of intrusion was unreasonable in light of the circumstances justifying the stop.   The purpose for John's detainment was not in furtherance of investigating a serious offense but instead a misdemeanor.   As John remembers, his behavior was not threatening or violent.   In short, John's recitation of events belies the argument that he posed a danger to anyone's physical safety.   Most important, when Brian sought to effectuate the stop, John was already in his house with the door nearly shut.   Given the nature of the offense and the questionable threat John posed, the degree of force employed by Brian was neither "reasonably related in scope to the situation at hand," nor could it be construed as such.

Viewing the facts in a light most favorable to the nonmoving party, Brian's argument that he is entitled to qualified immunity fails under this circuit's three-part inquiry.   *See Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009).   The Court finds that under the Martins' version of the facts a constitutional violation did occur.   Further, the law governing the Fourth Amendment is clearly established such that it would not condone kicking open a shutting door to a residence to detain someone under *Terry*.   Accordingly, Brian is not entitled to qualified immunity because it should have been sufficiently obvious that his alleged conduct was objectively unreasonable under this circuit's precedent regarding clearly established standards of constitutional care.

C. *Ryburn v. Huff*

Brian proposes that the Supreme Court's recent decision in *Ryburn v. Huff*, 132 S.Ct. 987 (2012), supports his previously raised argument that he was confronted with exigent circumstances when he arrived at the Martin Residence.  However, the facts of *Ryburn* are substantially different than the facts here.  In *Ryburn*, police learned of a rumor that a student was planning to "shoot up" his high school.  The rumor was so credible in the community that many parents decided to keep their children from attending school.  The officers went to the student's residence to question him and encountered his mother outside the house.  When the officers asked her if there were any weapons inside, she abruptly turned and ran into the house through the front door.  In light of her bizarre response and fearing that there could be weapons inside, the officers briefly entered the house in pursuit.  The Supreme Court found that the warrantless entry into the house was permissible under the totality of the circumstances and that the officers were entitled to qualified immunity.  *Id*. at 988-91.

Were the Court to consider the facts in the light most favorable to Brian, then perhaps *Ryburn* would support dismissal.  However, the structure of summary judgment prevents such a weighing of the facts.  Because no evidence has been offered to suggest that Brian knew or suspected that the Martins possessed dangerous implements in their residence, Brian had no legitimate reason, under the totality of the circumstances, to believe John was returning to his house to arm himself.  Additionally, at no point in the Martins' recollection were they physically threatening toward either Hannah or Brian.  Indeed, according to the Martins, the only person who exhibited any sort of hostile behavior was Brian.  Brian suggests that the series of interactions between the Martins and Hannah, along with John's reentering his home, viewed "as

21

a whole and not as a series of unrelated, mundane events," are analogous to the totality of circumstances in *Ryburn*, which the Supreme Court found to justify a warrantless entry on the basis of exigent circumstances. (*See* Docket No. 46-1, at 3.) Unlike the *Ryburn* mother's bizarre flight into the house when asked if there were guns inside, the facts here suggest John merely reentered the house to terminate the encounter with Brian. Therefore, considering the totality of the circumstances, it is incorrect to say that *Ryburn* would justify summary judgment.

## CONCLUSION

Defendant Brian Coyt has requested that the Court reconsider its prior ruling, (Mem. Op. & Order, Docket No.38), in which the Court held that the Plaintiffs had a reasonable expectation of privacy inside their home and that said right was clearly established so as to preclude qualified immunity. For the foregoing reasons, IT IS HEREBY ORDERED that the Defendant's Motion for Reconsideration (Docket No. 43) is DENIED.